**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SAFEX FOUNDATION, INC.**, | |
| Plaintiff, | |
| v. | Case No. 22-cv-572 (CRC) |
| **SAFELAUNCH VENTURES LIMITED,** *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

In 2015, Plaintiff Safex Foundation, Inc. ("Safex") entered the nascent cryptocurrency market by minting a token called "Safe Exchange Coin." Safex has since deployed three other cryptocurrencies: Safex Token, Safex Cash, and Wrapped Safex Cash. But in 2021, Defendant SafeLaunch Ventures Limited ("SafeLaunch") created a competing cryptocurrency called "SafeX." Concerned about the risk of confusion and harm to its brand, Safex filed this lawsuit, alleging that SafeLaunch engaged in unfair competition and trademark infringement under both the Lanham Act and D.C. common law. After SafeLaunch failed to engage in jurisdictional discovery and stopped participating in the litigation, the Court partially granted Safex's motion for default judgment. Specifically, the Court awarded declaratory relief and permanently enjoined SafeLaunch from using the "Safex" mark, but it ordered Safex to provide more evidence supporting its request for monetary relief and attorney fees.

Safex has now provided a memorandum in support of its requests, along with two declarations and several supporting documents. After careful consideration of this evidence, the Court finds that Safex's requested attorney fees are reasonable, but its attempt to recover

SafeLaunch's profits is only partially supported by the record. Accordingly, the Court will award Safex $845,269.40 in monetary relief and $130,149.00 in attorney fees.

## I.    Background

The Court presumes familiarity with its prior opinions describing the factual and procedural background of this case. See Safex Found., Inc. v. SafeLaunch Ventures Ltd. (Safex I), 694 F. Supp. 3d 1, 6–7 (D.D.C. 2023); Safex Found., Inc. v. SafeLaunch Ventures Ltd. (Safex II), No. 22-cv-572 (CRC), 2025 WL 2377972, at *1–2 (D.D.C. Aug. 15, 2025). To summarize, cryptocurrencies are "digital assets that hold value based primarily on what a purchaser is willing to pay for them." Safex I, 694 F. Supp. 3d at 6. They exist on a blockchain, which is "a kind of digital ledger that facilitates the creation of particular cryptocurrencies and records transactions using them." Id. Consumers can "store" their cryptocurrencies in a digital wallet, and they can buy, trade, or sell tokens on online exchanges and marketplaces. See id.

Safex develops, sells, and promotes its own line of cryptocurrencies. See Safex II, 2025 WL 2377972, at *1 (citing Compl. ¶ 6). One of those cryptocurrencies, Safex Cash, can be used to purchase goods and services on "Safex Marketplace," Safex's e-commerce platform. Id.; see Compl. ¶ 23.[1] Safex has used the brand name "Safex" or "SafeX" across its marketing, website, social media platforms, and merchandise. See Compl. ¶¶ 24–33, 67.

In July 2021, SafeLaunch minted a competing token called "SafeX," which uses the ticker "SFEX" on cryptocurrency trading platforms. Safex II, 2025 WL 2377972, at *1; Compl.

---

[1] Because SafeLaunch is in default, the Court may accept the well-pleaded factual allegations in the complaint as true. See Safex II, 2025 WL 2377972, at *3; Boland v. Elite Terrazzo Flooring, Inc., 763 F. Supp. 2d 64, 68 (D.D.C. 2011).

¶¶ 58–60.[2]  Unlike Safex Cash, SFEX could not be used to buy goods or services; instead, "venture capital investors" could purchase the token to fund "promising start-up companies" identified by SafeLaunch.  Safex II, 2025 WL 2377972, at *1.  The launch of SFEX caused considerable confusion among within the crypto community, as multiple media outlets and "disgruntled customers" mistook the token as a Safex product.  See, e.g., Compl. ¶¶ 63–66, 71–74.  In the midst of this confusion, SFEX gained considerable traction, reaching a market capitalization of $20 million at its peak.  Id. ¶ 3.

Safex sent multiple cease-and-desist letters to SafeLaunch in the months after SFEX's release.  See id. ¶¶ 89, 94.  SafeLaunch nonetheless continued to use the "Safex" mark, so Safex filed this lawsuit in March 2022.  As the Court previously explained:

> Safex alleges trademark infringement in violation of the Lanham Act, common law trademark infringement, and unfair competition in violation of D.C. common law. The complaint seeks $20 million in damages, a declaration that Safex is the rightful owner of the Safex trademark and SFEX ticker symbol and that SafeLaunch's use of these marks violates Safex's rights, and an order enjoining SafeLaunch from using the marks in connection with its business.

Safex II, 2025 WL 2377972, at *1 (citations omitted).  SafeLaunch moved to dismiss the complaint, arguing that the Court lacked personal jurisdiction over it; the Court agreed, but it allowed Safex to pursue limited jurisdictional discovery.  Id. at *2.  SafeLaunch's counsel then withdrew from the case, and the company failed to obtain replacement counsel.  Id.

After settlement discussions between the parties proved unsuccessful, the Clerk of the Court entered a default against SafeLaunch, and Safex moved for default judgment.  Id.  The Court concluded that SafeLaunch had waived personal jurisdiction and that Safex was entitled to default judgment on liability.  The Court thus granted Safex's requests for both declaratory and

---

[2] To avoid the risk of confusion, the Court will refer to SafeLaunch's token as "SFEX" throughout the remainder of this opinion.

permanent injunctive relief.  See id. at *4–6.  However, the Court deferred judgment on Safex's

request for monetary relief and attorney fees, directing it to (1) "submit affidavits and other

relevant documentation supporting its request for damages," and (2) "submit materials

establishing entitlement to [a fee] award, documenting the appropriate hours, and justifying the

reasonableness of the rates[.]"  Id. at *5–6 (citation and internal quotation marks omitted).  In

response to the Court's order, Safex submitted a memorandum in support of its request for

damages and fees, see Pl.'s Mem. of P. & A. in Supp. of Pl.'s Request for Damages and

Attorney's Fees ("Pl.'s Mem."), a declaration by its founder in support of its claim for

$1,209,063.19 of SafeLaunch's profits, see Declaration of Daniel Dabek ("Dabek Decl."),[3] and a

declaration by its counsel in support of its claim for $130,149.00 in attorney fees, see Declaration

of Joseph B. Evans ("Evans Decl.").  Safex's requests are ripe for consideration.

## II.    Legal Standards

The Lanham Act provides that a plaintiff is entitled to monetary relief when a defendant

commits trademark infringement.  See 15 U.S.C. § 1117(a).  "Although [] default establishes a

defendant's liability, unless the amount of damages is certain, the court is required to make an

independent determination of the sum to be awarded."  Adkins v. Teseo, 180 F. Supp. 2d 15, 17

(D.D.C. 2001).  The Court "has considerable latitude in determining the amount of damages."

Boland v. Elite Terrazzo Flooring, Inc., 763 F. Supp. 2d 64, 67 (D.D.C. 2011).  In doing so, the

Court may consider both "detailed affidavits" and "documentary evidence."  Flynn v. Mastro

Masonry Contractors, 237 F. Supp. 2d 66, 69 (D.D.C. 2002); see also Breaking the Chain

Found., Inc. v. Capitol Educ. Support, Inc., 589 F. Supp. 2d 25, 31 (D.D.C. 2008) ("[W]hen

---

[3] Safex's memorandum and declaration repeatedly request "$1,209,63.19" in monetary relief.  See, e.g., Pl.'s Mem. at 3, 5, 12; Dabek Decl. ¶ 5.  The Court assumes Safex is seeking $1,209,063.19.  See Dabek Decl. ¶¶ 42, 67 (listing subtotals of $12,650.00 and $1,196,413.19).

moving for a default judgment, the plaintiff must prove its entitlement to the amount of monetary damages requested.").

The Lanham Act also permits courts to "award reasonable attorney fees to the prevailing party" in "exceptional cases."  15 U.S.C. § 1117(a).  Through its default, SafeLaunch has "admitted to [the] willful infringement" described in the complaint, so Safex is entitled to a reasonable fee award.  Safex II, 2025 WL 2377972, at *5–6.  To calculate a reasonable fee award, courts begin by "multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate."  Harvey v. Mohammed, 951 F. Supp. 2d 47, 54 (D.D.C. 2013) (describing the "lodestar approach"); see also Murray v. Weinberger, 741 F.2d 1423, 1427 (D.C. Cir. 1984) ("[A]ny fee-setting inquiry must begin with the lodestar figure.").  The party seeking fees "bears the burden of . . . documenting the appropriate hours[] and justifying the reasonableness of the rates."  Covington v. District of Columbia, 57 F.3d 1101, 1107 (D.C. Cir. 1995).  However, the Court need not become a "green-eyeshade accountant[]," as "[t]he essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection."  Fox v. Vice, 563 U.S. 826, 838 (2011).

## III.  Analysis

In this supplemental round of default judgment briefing, Safex seeks to recover $1,209,063.19 of SafeLaunch's profits and $130,149.00 in attorney fees.  See Pl.'s Mem. at 12. The Court will grant Safex's request for profits in part and its request for fees in full.

### A.  SafeLaunch's Profits

Safex first seeks to recover the profits that SafeLaunch obtained from minting, promoting, and ultimately selling SFEX tokens.  The Lanham Act provides that a monetary award may include the defendant's profits arising from the unlawful acts of trademark

infringement.  See 15 U.S.C. § 1117(a).  But "[b]efore making an award on the basis of [the] defendant's profits, courts customarily require a plaintiff to show bad faith or willful infringement[.]"  Foxtrap, Inc. v. Foxtrap, Inc., 671 F.2d 636, 641 (D.C. Cir. 1982) (noting that "courts have insisted on a relatively egregious display of bad faith"); see also ALPO Petfoods, Inc. v. Ralston Purina Co., 913 F.2d 958, 968 (D.C. Cir. 1990).  As noted above, SafeLaunch "has admitted that it 'acted willfully, with knowledge of Safex's rights in the Safex Mark and SFEX ticker[.]'"  Safex II, 2025 WL 2377972, at *5 (alteration in original) (quoting Compl. ¶ 141).

Because Safex established SafeLaunch's willfulness, the Court "must assess the profits that [SafeLaunch] earned through the unlawful use of [Safex's] mark."  Yah Kai World Wide Enters., Inc. v. Napper, 292 F. Supp. 3d 337, 357 (D.D.C. 2018).  When assessing a defendant's profits, the plaintiff is only required to prove the defendant's sales; the defendant would then be required to prove any "cost or deduction claimed."  15 U.S.C. § 1117(a).  The Court may then "alter the resulting sum if it concludes that 'recovery based on profits is either inadequate or excessive . . . according to the circumstances of the case.'"  Yah Kai, 292 F. Supp. 3d at 357 (alteration in original) (quoting 15 U.S.C. § 1117(a)); see also Foxtrap, 671 F.2d at 642 n.11 ("[T]he court should strive to assure that the award it orders will deter the defendant, yet not be a windfall to plaintiff nor amount to punitive damages.").

Safex submits that SafeLaunch made at least $1,209,063.19 in profit from its sale of SFEX.  See Dabek Decl. ¶ 5.  This estimate is the sum of two sources of "income."  First, Safex claims that in early 2024, SafeLaunch directly exchanged SFEX tokens for approximately $12,650.00 on PancakeSwap, an online cryptocurrency exchange.  See id. ¶¶ 39–42; id., Ex. B; Safex I, 694 F. Supp. 3d at 6.  Second, Safex asserts that SafeLaunch distributed SFEX to its

executives, who then exchanged the tokens for $1,196,413.19 on PancakeSwap.  See Dabek

Decl. ¶¶ 66–69; id., Ex. C.  The Court addresses each source of income in turn.

### 1.  Direct Exchanges of SFEX

Safex first identifies five instances in which SafeLaunch directly exchanged SFEX for

Tether ("USDT"), a cryptocurrency "stablecoin" pegged to the United States dollar (meaning

that one USDT equals one U.S. dollar).  See Dabek Decl. ¶¶ 38–39.

Recall that cryptocurrency transactions are recorded on a blockchain.  See Safex I, 694 F.

Supp. 3d at 6.  SFEX is traded on the Binance blockchain.  Dabek Decl. ¶ 7.  The information

recorded on the Binance blockchain is publicly available on "BscScan," a website that Safex

describes as a "blockchain explorer."  Id. ¶ 6.  On BscScan, a user may find the date and time of

a cryptocurrency transaction, the transaction's identification number, the parties' wallet

addresses, and the amount of cryptocurrency that was traded.  Id. ¶ 8.  In this case, Safex used

BscScan to find "every transaction recorded on the Binance blockchain" involving SFEX.  Id.

To identify which of those transactions were connected to SafeLaunch, Safex pulled

SFEX's "tokenomics" from archived records of SafeLaunch's website.[4]  See id. ¶¶ 21, 23.

According to these tokenomics, SafeLaunch minted 10 million SFEX tokens.  Id. ¶ 24.

SafeLaunch then distributed the supply of SFEX according to predetermined allocations.  See id.

¶ 26.  For example, SafeLaunch reserved 2.5 million SFEX (i.e., 25 percent of the total supply)

for a "pre-sale" and/or "initial decentralized exchange offering" ("IDO").  Id. ¶ 26(a).  Based on

---

[4] Tokenomics refers to "the analysis of a cryptocurrency's fundamental characteristics," including "market capitalization, supply, inflation or deflation, how new tokens are distributed, utility, and many other factors."  Dabek Decl. ¶ 22 (citation omitted).  The Court notes that Safex's declaration cites to "exhibits" which purportedly show the archived version of SafeLaunch's website and SFEX's tokenomics.  See id. ¶¶ 19 (citing "Exhibit D"), 21 (citing "Exhibit E").  However, no such exhibits appear in the record.

the data pulled from BscScan and SFEX's tokenomics, Safex was able to identify SafeLaunch's cryptocurrency wallet address.  See id. ¶¶ 30–32, 37.

Safex then pulled the underlying data for 89 transactions to and from SafeLaunch's wallet between July 2021 and February 2024.  Id. ¶ 33; id., Ex. A.  Of those 89 transactions, Safex identified five instances in early 2024 where SafeLaunch exchanged SFEX for USDT on PancakeSwap.  Dabek Decl. ¶¶ 39–40; id., Ex. B.  In total, SafeLaunch exchanged approximately 249,545 SFEX for 12,650 USDT, resulting in $12,610.03 in proceeds.[5]  See id., Ex. B.  Put another way, SafeLaunch profited to the tune of $12,610.03 from the direct "sale" of SFEX in early 2024.

As explained above, the market value of SFEX—that is, the USDT that a consumer can receive in exchange for it—increases as demand for the token increases.  See Dabek Decl. ¶ 26(e) (noting that PancakeSwap maintained a "liquidity pool" of SFEX to facilitate trading).  In its complaint, Safex connected the demand for SFEX to SafeLaunch's trademark infringement; it alleged that SafeLaunch's use of the Safex mark caused "confusion" and led customers to "inadvertently purchase[]" SFEX when they intended to buy Safex's cryptocurrencies.  Compl. ¶ 130; see also id. ¶ 71 ("The closeness of the ticker SFEX to 'Safex' is causing customer confusion.  It is causing potential customers desiring to purchase Safex Token or Safex Cash to unwittingly buy [SFEX].").  Because Safex has adequately pled that the trade value of SFEX is "attributable to the unlawful use" of the Safex mark, Safex may recover SafeLaunch's profit from these direct exchanges.  Riggs Inv. Mgmt. Corp. v. Columbia Inv. Partners, LLC, 975 F.

---

[5] Safex claims that because SafeLaunch received 12,650 USDT, it made $12,650.00 in profit, as one USDT theoretically equals one U.S. dollar.  See Dabek Decl. ¶ 42.  However, Safex's documentation indicates that the exchange "proceeds" totaled only $12,610.03.  See id., Ex. B.  This discrepancy may be attributable to minor fluctuations in the stablecoin market, which can cause USDT's value to shift fractions of a cent above or below one U.S. dollar.

Supp. 14, 16–17 (D.D.C. 1997) (awarding the defendant's equity profits to the plaintiff because the defendant failed to show that its profits "were untainted by [its] wrongful conduct").

> 2.  *Distributions of "Team Tokens" and "Marketing Treasury Tokens"*

Safex next claims that SafeLaunch indirectly received $1,196,413.19 in profit from its distribution of SFEX tokens to company executives.  See Dabek Decl. ¶ 67; id., Ex. C.

> a.   Safex's Analysis of SafeLaunch's Profits

To understand this stream of "profits," the Court must revisit SFEX's tokenomics. SafeLaunch allocated the supply of 10 million SFEX tokens to several distinct categories.  As noted above, 2.5 million SFEX (i.e., 25 percent of the total supply) were sold at a pre-sale and/or IDO.  Dabek Decl. ¶ 26(a).  Another 100,000 SFEX (i.e., one percent of the total supply) were reserved for an "Airdrop," during which SafeLaunch sent SFEX to its customers' wallets "as a way to raise awareness" of the new cryptocurrency.  Id. ¶ 26(d).  An additional 200,000 SFEX (i.e., two percent of the total supply) were placed in a liquidity pool to facilitate trading on PancakeSwap.  Id. ¶ 26(e).  And 5 million SFEX (i.e., 50 percent of the total supply) were placed in larger liquidity pool "to facilitate decentralized trading of [SFEX] on the Binance blockchain." Id. ¶ 26(f).

The two remaining categories are at issue here.  First, 1.2 million SFEX (i.e., 12 percent of the total supply) were designated as "Team Tokens," which were "distributed to company executives" and could "be sold and used to raise money for the business."  Id. ¶ 26(c).  Second, 1 million SFEX (i.e., ten percent of the total supply) were designated as "Marketing Treasury [T]okens" and "set aside . . . to distribute to opinion leaders and influencers to publicly discuss or promote the company's token at conferences, on the internet, or on social media."  Id. ¶ 26(b). Safex notes that "[c]ryptocurrency companies generally have discretion over who is entitled to

9

receive Marketing Treasury [T]okens," id., and SFEX's tokenomics "contains no limitations on who these tokens could be distributed to," id. ¶ 69.

To determine which of the 89 transactions to or from SafeLaunch's wallet were Team Tokens or Marketing Treasury Tokens, Safex ruled out the transactions that fell "into the other categories of distributions discussed on SafeLaunch's Tokenomics Webpage." Id. ¶ 44.  That is, Safex identified the transactions associated with (1) the SFEX pre-sale and/or IDO, id. ¶¶ 47–53; (2) the liquidity pool on PancakeSwap, id. ¶ 46; and (3) a separate smart contract created by SafeLaunch, id. ¶¶ 54–59.  By process of elimination, Safex contends that the remaining seven transactions were "distributions" that "largely reflect Team Token[s] or Marketing Treasury Tokens." Id. ¶¶ 62, 68.  Those seven distributions were purportedly sent to eleven distinct wallets.  Id. ¶ 63.

For each of those eleven wallets, Safex isolated the transactions in which (1) SafeLaunch sent SFEX to the wallet, or (2) the wallet exchanged SFEX for USDT or a comparable stablecoin cryptocurrency pegged to the U.S. dollar.  See id. ¶ 64; id., Ex. C.  Based on these transactions, Safex asserts the wallets made $1,196,413.19 by "selling" SFEX in exchange for stablecoins. Dabek Decl. ¶ 67; id., Ex. C at 3.  Because SafeLaunch executives received Team Tokens and the company "could have directly profited" from Marketing Treasury Tokens, Safex seeks the value of all the SFEX "sold" by the eleven wallets.  Dabek Decl. ¶ 69.

### b.  Flaws in Safex's Analysis

While Safex's methodology for estimating SafeLaunch's profits appears reasonable, its analysis errs in at least three ways.  First, Safex labeled a transaction from SafeLaunch's wallet as both a "distribution" of Team Tokens or Marketing Treasury Tokens *and* a "direct exchange" of SFEX for USDT on PancakeSwap.  See id. ¶ 63 (asserting that row 79 of Exhibit A was a

"distribution" of Team Tokens or Marketing Treasury Tokens); id., Ex. A (listing row 79 as a transaction by SafeLaunch's wallet on January 19, 2024); id., Ex. B (listing the same transaction as a "direct exchange" of SFEX for USDT). In other words, Safex double counted a transaction.[6]

Second, Safex's calculation of SafeLaunch's profits includes *every* instance in which the eleven wallets exchanged SFEX for stablecoins, even if the SFEX did not originate from a "distribution" of Team Tokens or Marketing Treasury Tokens. For example, the first wallet received only one of the seven "distributions" from SafeLaunch's wallet, totaling 4,000 SFEX. See id., Ex. C (row 6). But between July 2021 and December 2021, that wallet received approximately 7,174 SFEX from SafeLaunch's wallet, see id. (rows 1, 2, and 6),[7] and it received approximately 32,603 SFEX from all sources, see id. (rows 1, 2, 3, 6, 7, 9–10, 13–14, 17, 20, and 23). Safex used the latter number when calculating the wallet's "profits" from "selling" SFEX, even though a majority of those tokens were *not* sent by SafeLaunch. See id. (listing a total of approximately 32,603 SFEX sold and $23,188.95 in proceeds). Put simply, Safex appears to have overcounted the profit that these wallets made from SafeLaunch's distributions.

Third, Safex has not shown that the seven distributions went to individuals associated with SafeLaunch. Safex concedes that "the distribution of Team Tokens or Marketing Treasury Tokens are not labeled as such in the underlying data." Dabek Decl. ¶ 44. Instead, Safex could

---

[6] Based on the Court's review of the data, the transaction in question appears to be a "direct exchange," not a "distribution." See Dabek Decl., Ex. A (rows 79 and 80 sharing a transaction identification number and showing a simultaneous outgoing transfer of SFEX and incoming transfer of USDT). Accordingly, the Court will not count that transaction as a "distribution."

[7] Rows 1 and 2 of Exhibit C correspond to transactions that Safex associated with the initial pre-sale and/or IDO of SFEX. See Dabek Decl. ¶ 47 (referring to rows 5 and 17 of Exhibit A).

11

only determine whether the transactions were "likely *either* a Team Token or Marketing Treasury Token distribution." Id. (emphasis added). To be sure, SFEX's tokenomics did not place a limitation on who could receive Marketing Treasury Tokens, and Safex asserts that it was "possible" that SafeLaunch "directly profited through the Marketing Treasury Tokens." Id. ¶ 69. But if any of the seven distributions were Marketing Treasury Tokens given to "opinion leaders and influencers," id. ¶ 26(b), it is hard to imagine how SafeLaunch could have "profited" from the eventual sale of those tokens.

c.    Recalculating SafeLaunch's Profits

In light of these shortcomings, the Court could simply deny Safex's request for SafeLaunch's profits and request another round of briefing. But "even where the record fails to substantiate fully the parties' specific contentions regarding the extent of the defendant's profits," the Court may "undertake to estimate those figures, and to adjust them as needed, in order to arrive at a fair and just damages figure, given the facts presented and the goal of ensuring that justice is served." Yah Kai, 292 F. Supp. 3d at 350 (citing Skydive Ariz., Inc. v. Quattrocchi, 673 F.3d 1105, 1110 (9th Cir. 2012)). The Court will do so here.

To begin, the Court accepts the premise that six of the seven transactions from SafeLaunch's wallet are "distributions" of Team Tokens or Marketing Treasury Tokens.[8] The Court will not count the seventh transaction as a "distribution" because it was already included as a "direct exchange" of SFEX for USDT. See Dabek Decl. ¶¶ 39–40; id., Ex. B (listing row 79 from Exhibit A as a "direct exchange"). Through these six transactions, SafeLaunch distributed a total of 853,513 SFEX. See Dabek Decl., Ex. A. From that total, the eleven wallets received

---

[8] The transactions are identified in rows 56, 60, 65, 67, 68, and 71 of Exhibit A to Safex's declaration. See Dabek Decl. ¶ 63; id., Ex. A.

12

847,513 SFEX.[9]  See id., Ex. C.  Because SafeLaunch's website indicated that 1.2 million SFEX would be designated as Team Tokens, the Court infers that the 847,513 SFEX were Team Tokens, not Marketing Treasury Tokens.  See Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co., 239 F. Supp. 2d 26, 30 (D.D.C. 2002) (recognizing that the party seeking damages in a motion for default judgment "is entitled to all reasonable inferences from the evidence offered").

To convert these tokens to U.S. dollars, the Court will calculate each wallet's ratio of "proceeds" per SFEX sold.  For example, the first wallet exchanged approximately 32,603 SFEX for $23,188.95 in stablecoin "proceeds"; the wallet therefore received approximately 71 cents per SFEX sold.  See Dabek Decl., Ex. C at 1.  Applying these ratios, the Court finds that the wallets made $832,659.37 in "profit" from the distributions sent by SafeLaunch's wallet:

| Last Four Digits of Wallet Address | SFEX Received from "Distributions" | Ratio of Proceeds Per SFEX Sold | Total Profit |
|---|---|---|---|
| 4cd3 | 4,000 | 0.711 | $2,845.02 |
| 3595 | 200,000 | 1.142 | $228,468.82 |
| 3bde | 0 | 0.036 | $0.00 |
| 8e83 | 21,071 | 1.054 | $22,210.15 |
| 78fd | 6,000 | 0.246 | $1,473.59 |
| 5852 | 65,000 | 0.757 | $49,224.16 |
| f08d | 42,142 | 1.180 | $49,746.48 |
| e816 | 276,000 | 0.756 | $208,753.84 |
| 9986 | 77,000 | 1.101 | $84,796.43 |
| 218d | 156,000 | 1.186 | $184,948.31 |
| d283 | 300 | 0.642 | $192.57 |
| **TOTALS** | **847,513** | **-** | **$832,659.37** |

---

[9] None of the eleven wallets received the February 27, 2022 distribution of 6,000 SFEX. Compare Dabek Decl., Ex. A (listing row 71 as a "distribution"), with id., Ex. C (not listing row 71's transaction identification number in any of the eleven wallets).  Rows 6, 29, 40, 104, 130, 142, 154, 174, 187, 244, 370, 379, 392, 410, 417, 434, 443, and 462 in Exhibit C to Safex's declaration correspond to the remaining distributions from SafeLaunch's wallet.  See id., Ex. C.

Combined with SafeLaunch's $12,610.03 profit from its direct exchange of SFEX for USDT, the Court concludes that SafeLaunch made $845,269.40 in profit from its use of the Safex mark.  Accordingly, the Court will award that amount to Safex.  See 15 U.S.C. § 1117(a).

B.  Attorney Fees

As the prevailing party, Safex is also eligible for attorney fees under the Lanham Act because this is an "exceptional case[]."  15 U.S.C. § 1117(a); Metropolis Special Police Dep't v. D.A.T.A. Mgmt. Consulting, LLC, No. 21-cv-2171 (BAH), 2022 WL 59390, at *7 (D.D.C. Jan. 6, 2022) ("When the plaintiff is the prevailing party, the D.C. Circuit has construed the 'exceptional cases' standard to require a court to 'find willful or bad faith infringement by the defendant in order to award attorney's fees to the plaintiff.'" (citation omitted)); but see Safex II, 2025 WL 2377972, at *5 n.2 (noting that a finding of willfulness "may no longer be required").  Accordingly, Safex seeks $130,149.00 in fees for the 112.7 hours spent by its counsel between March 2023 and September 2024.  See Pl.'s Mem. at 11; Evans Decl. ¶ 6.  The Court concludes that both the hourly rate and the number of hours billed by Safex's counsel are reasonable, so it will grant the fee request in full.

First, the billing rates for Safex's counsel are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984).  To be sure, the hourly rates for Safex's counsel—which range from $1,105 to $1,375 per hour—exceed those provided by the Legal Services Index ("LSI") Laffey matrix.  See Evans Decl., Ex. E (updated LSI Laffey Matrix); Salazar v. District of Columbia, 809 F.3d 58, 64 (D.C. Cir. 2015) (holding that the district court did not abuse its discretion by applying fee rates from the LSI Laffey matrix).  But fee matrices are "somewhat crude," so fee applicants may supplement fee indices with additional

14

evidence, including "recent fees awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases."  Eley v. District of Columbia, 793 F.3d 97, 101 (D.C. Cir. 2015) (quoting Covington, 57 F.3d at 1109).

Safex represents that the requested billing rates are "set annually by [its] counsel's law firm and are its ordinary and customary rates."  Pl.'s Mem. at 6 (citing Evans Decl. ¶ 13).  It has highlighted its counsel's qualifications and experience in cryptocurrency matters.  See, e.g., Evans Decl., Ex. A–D.  It also provided evidence indicating that the same law firm charges similar rates in bankruptcy proceedings involving the cryptocurrency industry, see Evans Decl. ¶¶ 13, 16, and other law firms bill at comparable rates for matters involving intellectual property, id. ¶ 15; id., Ex. F.  In short, Safex has carried its burden of showing the prevailing market rates, as well as its counsel's skill, experience, reputation, and ordinary billing practices.  See Covington, 57 F.3d at 1107.

Second, the number of hours billed is reasonable.  Safex is not requesting fees for all of the hours expended during this litigation; it is only seeking fees for the time its counsel spent "preparing and serving jurisdictional discovery on SafeLaunch" and "engaging in routine settlement discussions directly with representatives of SafeLaunch."  Pl.'s Mem. at 7.  Indeed, the first billed time entry occurred *after* the Court had already issued a memorandum opinion and order on SafeLaunch's motion to dismiss.[10]  See Evans Decl., Ex. Q at 3; id., Ex. R at 1.  As demonstrated by the billing records, most of the requested hours were for work by an associate who bills at a lower rate than his co-counsel.  See Evans Decl. ¶ 8; id., Ex. R.  The Court further acknowledges that Safex exercised reasonable billing judgment by removing certain time entries

_____

[10] Safex also does not seek to recover fees for the time that its counsel spent preparing the motion for default judgment.  See Pl.'s Mem. at 10.

15

during the attempted jurisdictional discovery and settlement discussions.  See Evans Decl. ¶¶ 18–19; id., Ex. Q at 6–7, 10; Hensley v. Eckerhart, 461 U.S. 424, 434 (1983) ("In the private sector, 'billing judgment' is an important component in fee setting.  It is no less important here.  Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." (citation omitted)).  In light of Safex's counsel's conservative billing practices, the Court will award the lodestar figure of $130,149.00 in attorney fees.

## IV.  Conclusion

For the foregoing reasons, the Court will amend its prior [50] Order granting in part and denying in part [48] Plaintiff's Motion for Default Judgment.  A separate Order shall accompany this memorandum opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date:  March 31, 2026

16